## STATE OF CONNECTICUT *v.* MARK CLARK
### (SC 16258)

McDonald, C. J., and Borden, Palmer, Sullivan and Vertefeuille, Js.*

* The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued September 29, 2000—officially released January 30, 2001

*Earl I. Williams*, with whom was *Jerald S. Barber*, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom were *Guy W. Wolf III*, former senior assistant state's attorney, and, on the brief, *Frank S. Maco*, state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The principal issue in this appeal is whether the trial court properly denied the defendant's motion to suppress cocaine seized pursuant to a warrantless patdown search for weapons. The defendant claims that the search and seizure violated his constitu-

tional rights under the fourth amendment to the United States constitution,[1] and article first, §§ 7[2] and 9,[3] of the Connecticut constitution. We disagree.

The state charged the defendant, Mark Clark, with possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b),[4] possession of narcotics with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b),[5] and failure to

[1] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment to the United States constitution is made applicable to the states through the fourteenth amendment. E.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[4] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[5] General Statutes § 21a-278a (b) provides: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense,

appear in the first degree in violation of General Statutes § 53a-172 (a) (1).[6] The defendant moved to suppress the seized cocaine on the ground that the police did not have a reasonable and articulable suspicion to detain him or probable cause to conduct a warrantless search of his person and seizure of the contraband found thereon. After an evidentiary hearing, the trial court, *Wiese, J.*, denied the defendant's motion to suppress. Pursuant to General Statutes § 54-94a[7] and Prac-

possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

[6] General Statutes § 53a-172 (a) provides in relevant part: "A person is guilty of failure to appear in the first degree when (1) while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear . . . ."

The charge of failure to appear was added when, on November 10, 1998, the defendant, while out on bail, "wilfully failed to appear when legally called according to the terms of his bail bond . . . ."

[7] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to

tice Book (1999) § 61-6,[8] the defendant then entered a conditional plea of nolo contendere to the charges of possession of narcotics with intent to sell and failure to appear in the first degree.[9] The trial court, *DiPen-*

be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[8] Practice Book (1999) § 61-6 provides: "(a) When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement, or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this subsection shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution. The court shall not accept a nolo contendere plea pursuant to this subsection where the denial of the motion to suppress would not have a significant impact upon the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere plea where the record available for review of the denial of the motion to suppress or motion to dismiss is inadequate for appellate review of the court's determination thereof.

"(b) With the approval of the court, after a hearing to consider any objections thereto, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any motion made prior to the close of evidence, which motion must be specified in such written reservation. If the defendant prevails on appeal, the judgment shall be set aside and the defendant shall be allowed to withdraw the conditional plea of guilty or nolo contendere after the case has been remanded to the trial court. A plea of guilty or nolo contendere under this subsection shall not constitute a waiver of nonjurisdictional defects in the criminal prosecution. The court shall not accept a plea of guilty or nolo contendere pursuant to this subsection where the adverse determination of the specified motion would not have a significant impact on the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere or guilty plea where the record available for review of the ruling upon the specified motion is inadequate for appellate review of the court's determination thereof."

[9] The remaining charge of possession of narcotics with intent to sell within 1500 feet of a school subsequently was nolled.

*tima, J.*, accepted the defendant's conditional plea and rendered judgment thereon.[10] The defendant then appealed to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c)[11] and Practice Book § 65-1.[12] We conclude that the defendant's motion to suppress properly was denied. Accordingly, we affirm the judgment of the trial court.

At the hearing on the defendant's motion to suppress, the trial court found the following relevant facts. On May 20, 1998, Officer Michael Morris and Sergeant Karl Pettersen of the Torrington police department narcotics enforcement unit[13] obtained a search warrant for apart-

---

[10] The defendant was sentenced to a term of ten years imprisonment, execution suspended after five years, and five years probation, for possession of narcotics with intent to sell. The defendant was sentenced on the charge of failure to appear in the first degree to a term of three years imprisonment, execution suspended, and five years probation, to be served concurrently with the sentence for possession with intent to sell. The total effective sentence imposed was ten years imprisonment, execution suspended after five years, followed by five years probation.

[11] General Statutes § 51-199 (c) provides: "The Supreme Court may transfer to itself a cause in the Appellate Court. Except for any matter brought pursuant to its original jurisdiction under section 2 of article sixteen of the amendments to the Constitution, the Supreme Court may transfer a cause or class of causes from itself, including any cause or class of causes pending on July 1, 1983, to the Appellate Court. The court to which a cause is transferred has jurisdiction."

[12] Practice Book § 65-1 provides: "When, pursuant to General Statutes § 51-199 (c), the supreme court (1) transfers to itself a cause in the appellate court, or (2) transfers a cause or a class of causes from itself to the appellate court, the appellate clerk shall notify all parties and the clerk of the trial court that the appeal has been transferred. A case so transferred shall be entered upon the docket of the court to which it has been transferred. There shall be no fee on such transfer. The appellate clerk may require the parties to take such steps as may be necessary to make the appeal conform to the rules of the court to which it has been transferred, for example, supply the court with additional copies of the record and the briefs."

[13] The primary function of the department's narcotics enforcement unit is to enforce Connecticut's narcotics laws within its jurisdiction. All members of the unit are specially trained in the field of narcotics and are familiar with the practices and habits of drug dealers.

ment 7 at 156 Oak Avenue in Torrington. The apartment was rented to and occupied by Heather Han. The warrant was issued pursuant to an ongoing investigation of the apartment, during which Officer John Murphy, another member of the narcotics enforcement unit, had been informed of numerous complaints from tenants in the building regarding the pedestrian traffic coming and going from the apartment. Morris and Murphy also had obtained additional information about Han from a reliable confidential informant. That informant stated that he or she had personal knowledge that Han was selling crack cocaine out of her apartment.[14]

The affidavit for the search warrant represented that the informant had told the police that Han's supplier was "a black male who drives a black colored Chevrolet Blazer." The affidavit also stated that Murphy and Morris had seen a vehicle fitting that description in the parking lot of 156 Oak Avenue during surveillance. The license plate number of the vehicle indicated that it was registered to the defendant. The affidavit also represented that, in the course of their investigation, Murphy and Morris had supervised the informant during at least two controlled purchases of crack cocaine from Han. Moreover, on the evening of May 21, 1998, at approximately 9:30 p.m., Morris arrested two persons who had just purchased crack cocaine from Han at 156 Oak Avenue. Shortly thereafter, on that same evening, the police executed the search warrant. Morris, Murphy and Pettersen were at the scene, along with Officer Mark Zbell, a youth officer responsible for two minor children who were in the apartment.[15]

---

[14] The informant told the officers that Han had bragged about selling $9000 worth of crack cocaine over the course of a recent weekend.

[15] In addition to Morris, Murphy, Pettersen and Zbell, Detective Joan O'Roarke and Officer Dave Wood also were present, according to Murphy's testimony.

At the time the warrant was executed, Han was in the apartment, along with another woman[16] and the two children. Inside the apartment, the officers recovered cash, marijuana, an empty beer can altered for use in smoking crack cocaine and two empty plastic baggies and pieces torn therefrom containing residue of a white substance. In addition, the officers confiscated a letter from Han to a man named "Funk," whom Han described as her supplier. In that letter, Han asked for money and referred to "sling[ing]"[17] for Funk "w/out [sic] Mark knowing."

During execution of the search warrant, the officers did not find any cocaine. It appeared to the officers that Han had exhausted her supply of drugs at that time. At the request of one of the officers, Han placed a telephone call to Funk. She was unable, however, to reach Funk at that time. While the police continued to collect evidence in the apartment, Morris returned to the parking lot to undertake surveillance for the safety of the searching officers. While conducting the surveillance, he observed a black Chevrolet Blazer enter the parking lot. A black male exited the vehicle and proceeded to Han's apartment. Morris alerted the other officers by radio that a black male was ascending the stairs toward Han's apartment. Morris then verified the license plate of the vehicle and determined that it was the Chevrolet Blazer owned by the defendant.

Murphy was in the kitchen, and Zbell was nearby, when the defendant entered the kitchen area of Han's apartment without knocking.[18] The defendant was

---

[16] Allison Pasquale, the other woman at the scene, admitted to having ingested crack cocaine that she had found on the floor of the apartment. Murphy testified that the officers conducted a patdown search of both Han and Pasquale upon entering the apartment.

[17] "Slinging" is slang for selling drugs.

[18] The defendant testified that he did knock before he entered the apartment. The trial court, however, credited Murphy's contrary testimony.

asked to identify himself and he indicated that his name was Mark Clark.[19] Murphy identified himself as a police officer and explained to the defendant that the officers were executing a search warrant. Upon receipt of this information, the defendant became "very nervous, visibly shaking [and] uncomfortable."[20] Because of his demeanor and his unannounced entry into the apartment, Murphy determined that it was necessary to conduct a patdown of the defendant for weapons in order to ensure the safety of himself and the other officers.[21]

Murphy proceeded to pat down the defendant, starting from his upper body and moving downward toward his feet. During the patdown, Murphy observed a large bulge in one of the defendant's socks.[22] Zbell, who was

[19] Murphy testified at the suppression hearing that he did not know who the defendant was before the defendant entered the apartment and identified himself.

[20] Zbell was standing in a doorway in view of the kitchen when the defendant entered the apartment. He also observed the defendant's behavior.

[21] Murphy also testified that, based on the training and experience of the members of the narcotics enforcement unit, there often is a significant danger that individuals involved in the drug trade are armed and dangerous.

[22] The defendant was wearing shorts during this incident, making the bulge in his sock clearly visible to Murphy and Zbell once the patdown commenced. The assistant state's attorney questioned Murphy on direct examination as follows:

"Q. Now . . . at the time you first encountered [the defendant], what was he wearing?

"A. A hat, a shirt, a pair of shorts, a pair of socks and shoes.

\* \* \*

"Q. And what kind of shorts?

"A. Like jean shorts.

"Q. Okay. Cutoffs?

"A. Yes; yes.

"Q. All right. And you said shoes. What type of shoes?

"A. To the best of my recollection, sneakers.

"Q. And socks?

"A. With white athletic socks, yes.

"Q. So the shorts fell far short from the top of the socks?

"A. Yes.

"Q. Top of the socks or, rather, the socks are clearly visible to you?

"A. Yes."

standing in close proximity to Murphy during the patdown, also noticed the large bulge in the defendant's sock. The defendant was not handcuffed during the patdown of his exterior clothing. When Murphy touched the bulge in the defendant's sock, he felt a "plasticky packaging material and then [a] rock- or chunk-like substance." Upon feeling the object, Murphy immediately recognized it as a large chunk of crack cocaine.[23] Once Murphy removed the object and confirmed that it was crack cocaine, the defendant was arrested and taken into custody.

The defendant filed a motion to suppress the evidence seized, claiming that the search conducted by the police violated the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution. The defendant argued in his motion that: (1) the cocaine was seized "without a warrant or other lawful authority"; (2) "[t]he search and seizure was unreasonable and illegal because there was no probable cause" to believe that he was carrying a weapon or illegal contraband; and (3) his initial detention and patdown "was not based upon a reasonable and articulable suspicion that he had committed or was about to commit a crime."

The trial court conducted an evidentiary hearing on the defendant's motion to suppress. Thereafter, the trial court denied the defendant's motion in an oral decision, upholding the validity of the patdown search on the ground that the officer had a reasonable and articulable suspicion that the defendant might be armed and dan-

---

[23] At the suppression hearing, Murphy testified that he had been involved in hundreds of narcotics arrests and had seen crack cocaine on many occasions. He also estimated that he had handled crack cocaine approximately sixty to seventy times. After seizing the object from the defendant's sock, it was confirmed to be crack cocaine.

gerous.[24] The trial court concluded that the observations of both Murphy and Zbell of the large bulge in the defendant's sock justified their suspicion that the defendant could be carrying a weapon. The trial court further concluded that, when Murphy conducted the patdown and felt what he believed to be a rock of crack cocaine, he had probable cause to believe that the defendant was in possession of illegal contraband and, therefore, had probable cause to arrest the defendant and seize the narcotics from his sock.

We are not persuaded by the defendant's argument that the patdown search leading to the discovery of drugs was unconstitutional. To the contrary, we agree with the state that the defendant lawfully was detained based on a reasonable and articulable suspicion that he was associated with the drug operation under investigation, and that he might have been armed. The defendant was described in the search warrant, and the name "Mark" was mentioned in the letter referencing drug sales that was recovered from Han's apartment while officers were executing the search warrant. Thus, the police had reason to believe that the defendant was involved in drug trafficking. Once the officers observed the bulge in the defendant's sock, they had additional justification to search for what might have been a weapon. These facts gave the officers reasonable grounds to believe that the defendant had committed, or was in the process of committing, a felony. See General Statutes § 54-1f (b).[25] Once it was apparent to Murphy

---

[24] Murphy testified that it is common knowledge that individuals involved in the drug trade often are armed and dangerous and, for that reason, he chose to conduct an immediate patdown of the defendant. Connecticut case law supports this proposition. *State* v. *Trine*, 236 Conn. 216, 226, 673 A.2d 1098 (1996).

[25] General Statutes § 54-1f (b) provides: "Members of the Division of State Police within the Department of Public Safety or of any local police department or any chief inspector or inspector in the Division of Criminal Justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."

that the bulge in the defendant's sock was crack cocaine, he had probable cause to arrest the defendant and seize the contraband.

Moreover, even before discovery of the cocaine, the police had probable cause to arrest the defendant based on informant tips, the description of him in the warrant affidavit, the timing of his entry into Han's apartment and the reference to a man named Mark in the letter to Funk found in Han's apartment. We conclude that the warrantless search and seizure of the drugs from the defendant's person was constitutionally valid, and, therefore, the trial court properly denied the defendant's motion to suppress the narcotics seized as a result of the initial, valid patdown search.[26]

As a preliminary matter, we set forth the standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998), quoting *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997). Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. See, e.g., *State* v. *Bergin*, 214 Conn. 657, 661–62, 574 A.2d 164 (1990). The trial court's determination on the issue, therefore, is subject to plenary review on appeal. See *Cheshire Mortgage*

---

[26] The warrantless search and seizure was constitutional because there was probable cause to arrest the defendant under the three exceptions to the warrant requirement hereinafter set forth in the text of this opinion.

*Service, Inc.* v. *Montes*, 223 Conn. 80, 88, 612 A.2d 1130 (1992).

"Because a trial court's determination of the validity of a patdown search implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence." *State* v. *Trine*, 236 Conn. 216, 225, 673 A.2d 1098 (1996); see also *State* v. *Colvin*, supra, 241 Conn. 656; *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). However, "[w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Ross*, 251 Conn. 579, 594, 742 A.2d 312 (1999), quoting *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 346, 736 A.2d 824 (1999).

The state argues that this case falls within the following three exceptions to the warrant requirement: (1) the *Terry* "stop and frisk" exception;[27] (2) the "plain feel" exception;[28] and (3) the search incident to lawful arrest exception. We conclude that, under these exceptions, the initial detention and the subsequent warrantless search and seizure were constitutional. The state also argued in the trial court that the evidence was admissible under the inevitable discovery doctrine.[29]

[27] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[28] *Minnesota* v. *Dickerson*, 508 U.S. 366, 375–76, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993); *State* v. *Trine*, supra, 236 Conn. 224. We will also briefly discuss the plain view exception, which helps to clarify the plain feel exception.

[29] "Under the inevitable discovery rule, evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the state demonstrates by a preponderance of the evidence that the evidence would have been ultimately discovered by lawful means." *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); see also *Nix* v. *Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). "To qualify for admissibility the state must demonstrate that the lawful means which made discovery inevitable were

We agree with the trial court that it is unnecessary to evaluate the state's alternative position with respect to the inevitable discovery doctrine because the patdown search and subsequent seizure, although conducted without a warrant, were lawful under the aforementioned exceptions to the warrant requirement.[30]

I

## THE *TERRY* STOP AND FRISK

"Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9] . . . of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." *State* v. *Trine*, supra, 236 Conn. 223; see *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992). "If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search to discover weapons." *State* v. *Trine*, supra, 223–24; accord *Terry*

possessed by the police and were being actively pursued prior to the occurrence of the constitutional violation." *State* v. *Badgett*, supra, 433.

[30] On appeal, the defendant argues that the police went beyond the four corners of the search warrant when they requested that Ilan contact her supplier, Funk. As a result, the defendant argues that a separate search had begun and that the police were acting beyond their authority when they remained in the apartment and subsequently searched him upon entry.

We decline to review this claim. "Where an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995). "[C]laims on appeal that are inadequately briefed are deemed abandoned." (Internal quotation marks omitted.) *State* v. *Salvatore*, 57 Conn. App. 396, 401, 749 A.2d 71, cert. denied, 253 Conn. 921, 755 A.2d 216 (2000), quoting *State* v. *Barnett*, 53 Conn. App. 581, 599, 734 A.2d 991, cert. denied, 250 Conn. 918, 738 A.2d 659 (1999).

v. *Ohio*, supra, 27; *State* v. *Wilkins*, 240 Conn. 489, 495–96, 692 A.2d 1233 (1997); *State* v. *Williams*, 157 Conn. 114, 118, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969).[31]

When conducting a patdown search of a suspect, the officer is limited to an investigatory search for weapons in order to ensure his or her own safety and the safety of others nearby. *Terry* v. *Ohio*, supra, 392 U.S. 29; see also *State* v. *Trine*, supra, 236 Conn. 224. "The officer cannot conduct a general exploratory search for whatever evidence of criminal activity [he or she] might find." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 224, quoting *Terry* v. *Ohio*, supra, 30; see also *Minnesota* v. *Dickerson*, 508 U.S. 366, 378, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). Logically, therefore, "a patdown search for weapons that is justified at its inception becomes constitutionally infirm if the search . . . becomes more intrusive than necessary to protect the safety of the investigating officer." *State* v. *Trine*, supra, 224; accord *State* v. *Edwards*, 214 Conn. 57, 72, 570 A.2d 193 (1990); *State* v. *Mitchell*, 204 Conn. 187, 197, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); see also *Minnesota* v. *Dickerson*, supra, 378.

In order to determine the constitutional validity of the patdown search in this case, we "must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . .

---

[31] We see nothing unlawful in the initial detention of the defendant in this case, even prior to the commencement of the patdown search. "[T]he police may detain an occupant of premises while a search warrant is being executed." (Internal quotation marks omitted.) *State* v. *Torres*, 197 Conn. 620, 625, 500 A.2d 1299 (1985), citing *Michigan* v. *Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). If a visitor is not considered an "occupant," as the term is used in *Summers*, however, the detention of an individual still may be justified under *Terry* as long as there is reasonable suspicion of criminal activity. See *State* v. *Torres*, supra, 625.

[We] . . . must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 644, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), quoting *State* v. *Oquendo*, supra, 223 Conn. 654. This is, in essence, a totality of the circumstances test. See *United States* v. *Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State* v. *Aillon*, 202 Conn. 385, 399, 521 A.2d 555 (1987).

We recently concluded that it was reasonable for officers executing a search warrant to fear that subjects involved in narcotics might be armed and dangerous. See *State* v. *Trine*, supra, 236 Conn. 225–26. In *Trine*, the defendant was one of three people present when officers executing a search warrant for narcotics entered a residence suspected as a location for drug sales.[32] Id., 219–20. Upon entry, the lead officer addressed the defendant, the individual closest to him, and conducted a patdown search to determine whether he was carrying a weapon. Id., 220. The officer testified that, after fifteen years on a statewide narcotics task force, he was fully aware that weapons often are found during the execution of a search warrant for narcotics. See *State* v. *Trine*, 37 Conn. App. 561, 563, 657 A.2d 675 (1995), rev'd, 236 Conn. 216, 673 A.2d 1098 (1996). The officer therefore conducted a patdown search in order to ensure his safety and that of other officers. See id., 564.

In *Trine*, we concluded, relying on *Terry*, that the patdown search conducted by the police was constitutional at its inception because it was conducted based upon a reasonable and articulable suspicion that the

[32] The defendant in the present case, like the defendant in *Trine*, did not dispute the validity of the underlying search warrant.

defendant might have been armed and dangerous. *State* v. *Trine*, supra, 236 Conn. 223. In our discussion of reasonable suspicion, we concluded that "[t]he execution of a warrant to search for narcotics is the kind of transaction that [may] give rise to sudden violence . . . ." (Internal quotation marks omitted.) Id., 225, quoting *Michigan* v. *Summers*, 452 U.S. 692, 702, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Furthermore, Connecticut courts repeatedly have noted that "[t]here is a well established correlation between drug dealing and firearms." *State* v. *Cooper*, 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993); see also, e.g., *State* v. *Carter*, 228 Conn. 412, 424 n.15, 636 A.2d 821 (1994); *State* v. *Delossantos*, 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). Federal courts also have recognized this fact of life. E.g., *Michigan* v. *Summers*, supra, 452 U.S. 702 n.17 (recognizing that execution of search warrant for narcotics "may give rise to sudden violence"); *United States* v. *$109,179 in United States Currency*, 228 F.3d 1080, 1084 (9th Cir. 2000) (officer had reasonable suspicion to believe that defendant involved in narcotics operation might be armed); *United States* v. *Rivera*, 844 F.2d 916, 926 (2d Cir. 1988) ("weapons are . . . 'tools of the [narcotics] trade' "); *United States* v. *Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (search of woman's handbag for weapons considered reasonable, self-protective "minimal intrusion" when owner of handbag entered apartment at which search warrant was being executed and with individuals known to be dealing in narcotics).

This known connection between drugs and guns, coupled with the surrounding circumstances, satisfies the reasonable suspicion standard set forth in *Terry* v. *Ohio*, supra, 392 U.S. 27. In order to justify the reasonableness of an investigatory search, "[an] officer need not be absolutely certain that [an] individual is armed;

[rather] the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Id. Thus, "[r]easonable and articulable suspicion is an objective standard"; (internal quotation marks omitted) *State* v. *Trine*, supra, 236 Conn. 224; based not on the officer's "inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry* v. *Ohio*, supra, 27. Based on the foregoing, it is clear that a reasonably prudent person, police officer or layperson would recognize the correlation between drugs and violence.

In this case, the following circumstances provided ample reason to believe that the defendant was associated with the drug trafficking under investigation and that he might have been armed: (1) he entered Han's apartment, unannounced, at a time when officers had become aware that her drug supply was exhausted; (2) he became visibly nervous and uncomfortable when he discovered the officers in Han's apartment and learned of their purpose; and (3) the name "Mark" was mentioned in a letter referencing drug sales that was found at Han's apartment. The record also reflects that the defendant was identified by an informant as Han's supplier, and that his black Chevrolet Blazer, with an identifying license plate, was observed at the location under investigation on more than one occasion, including the evening of May 21, 1998.[33] We conclude, therefore, that Murphy had sufficient, objective reasons for believing that the defendant was involved in drug trafficking and that, because of that connection, he might have been armed and dangerous.[34] See id., 21–22. Accordingly, we

[33] The search warrant affidavit mentions the defendant and contains a description of the defendant's vehicle.

[34] In its decision denying the motion to suppress, the trial court noted that both Murphy and Zbell noticed a large bulge in the defendant's sock upon instituting the patdown search. The trial court recognized that "[i]t is possible to conceal a knife or firearm within [a] sock."

conclude that Murphy's decision to conduct a *Terry* stop and frisk for weapons was not unconstitutional.

We also conclude that Murphy did not exceed the legitimate scope of a *Terry* stop and frisk for weapons. In *State* v. *Trine,* supra, 236 Conn. 216, the officer testified that he conducted an "open, flat-handed patdown of the exterior of the defendant's clothing." Id., 226. The officer testified that he felt a hard object in the defendant's pocket that made a sound like plastic when touched. Id., 220–21. When he felt the object in the defendant's pocket, he did not manipulate it, but continued the search. Id., 226. "It was only after having ascertained that the defendant was unarmed that [the officer], believing that the object that he had felt during the patdown search was packaged rock cocaine, searched the defendant's pocket and seized the cocaine." Id., 226–27. We upheld the validity of that search. Id., 227.

In this case, Murphy testified that he conducted just such an open, flat-handed patdown search of the defendant's exterior clothing. Murphy stated that when he touched the bulge in the defendant's sock, he immediately recognized it as crack cocaine based on the feel of the "plasticky packaging material" and the "rock- or chunk-like substance." Murphy did not place his hands in the defendant's "pockets or under the outer surface of [his] garments"; *Terry* v. *Ohio,* supra, 392 U.S. 29; nor did he squeeze, slide or otherwise manipulate the lump that he had seen and felt in the defendant's sock. Cf. *Minnesota* v. *Dickerson,* supra, 508 U.S. 378. Although Murphy knew that the defendant was not armed, it was *immediately apparent* to him that the defendant was in possession of crack cocaine, thereby giving him probable cause to conduct a search of the defendant's sock and to seize the cocaine found therein.

In its decision denying the defendant's motion to suppress, the trial court credited the evidence presented by the officers at the suppression hearing. In finding that a reasonable and prudent person would have concluded that the defendant was involved in drug activity and might have been in possession of a weapon, the trial court further concluded that Murphy's patdown search of the defendant was lawful. We agree.

## II

### THE PLAIN FEEL EXCEPTION

Having determined that the initial intrusion was constitutionally permissible, we next turn to the constitutionality of the seizure of the cocaine from the defendant's sock. Relying on *Trine*, the trial court concluded that article first, § 7, "does not categorically bar a police officer from seizing, without a warrant, nonthreatening contraband that the officer feels during the patdown search." We agree with the trial court and conclude that Murphy did not violate the defendant's constitutional rights when he seized the cocaine from the defendant's sock.

In *Minnesota* v. *Dickerson*, supra, 508 U.S. 375–76, the United States Supreme Court established the plain feel exception to the warrant requirement, as a matter of federal constitutional law.[35] Under *Dickerson*, a police

---

[35] Understanding the plain view doctrine is important to understanding the plain feel doctrine. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota* v. *Dickerson*, supra, 508 U.S. 375; see *Horton* v. *California*, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). "[I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." (Internal quotation marks omitted.) *Minnesota* v. *Dickerson*, supra, 375.

The United States Supreme Court has seen no reason to favor visual perception over tactile perception. Id. Thus, the plain feel doctrine finds its

officer acting without a warrant may seize contraband that the officer has detected through the sense of touch during a lawful patdown search. Id. Specifically, the United States Supreme Court held that, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."[36] (Emphasis added.) Id.

In *State* v. *Trine*, supra, 236 Conn. 228–29, this court considered the plain feel exception to the fourth amendment warrant requirement as set forth in *Dickerson*, and recognized the applicability of that exception to the warrant requirement of article first, § 7, of the state

roots in the same rationale as the plain view doctrine, but relies on a police officer's sense of touch to give rise to probable cause. See id., 375–76. The court has pointed out that "*Terry* [v. *Ohio*, supra, 392 U.S. 1] itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure . . . [t]he very premise . . . [being] that officers will be able to detect the presence of weapons through the sense of touch . . . ." *Minnesota* v. *Dickerson*, supra, 508 U.S. 376. Both *Terry* and *Dickerson* require that an officer have probable cause before seizing any item, ensuring against abuse of authority and speculative seizures. Id. "[S]eizure of an item whose identity is already known occasions no further invasion of privacy"; id., 377; and when the item is known to be illegal contraband, its seizure is fully supported by probable cause.

[36] The constitutional validity of the patdown search is an important threshold issue with respect to the plain feel doctrine. In *Minnesota* v. *Dickerson*, supra, 508 U.S. 379, the search and seizure was held to be constitutionally impermissible because the officer's patdown search went beyond the narrow parameters set forth in *Terry*, which was intended only to authorize an officer to determine whether a suspect is armed. See id., 373; *Sibron* v. *New York*, 392 U.S. 40, 65–66, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). The search in *Dickerson* was unconstitutional because the officer knew that the defendant did not possess a weapon after conducting the patdown search, but manipulated the object in the defendant's pocket to determine whether it was contraband. *Minnesota* v. *Dickerson*, supra, 378–79.

constitution.[37] We held that "[t]he fundamental premise of [*Dickerson*] is that a police officer's tactile perceptions, formed during a lawful patdown search, in appropriate circumstances may provide the officer with probable cause to believe that an object felt during the search is nonthreatening contraband." *State* v. *Trine*, supra, 230.[38]

The facts of the present case satisfy the requirements of the plain feel doctrine. Having held the initial patdown of the defendant to be valid, we look to the manner in which the patdown was conducted and to the officer's immediate conclusion as to what he felt to determine whether the subsequent search and seizure was valid under *Dickerson* and *Trine*. Murphy testified that he has been a member of the Torrington police department for approximately eleven years, five and one-half years as a member of the narcotics enforcement unit. He also testified that he had made hundreds

---

[37] There are many cases in which we have adopted federal constitutional principles to guide our interpretation of our state constitution. See, e.g., *State* v. *Webb*, 252 Conn. 128, 138, 147, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000) (relying on federal analysis of eighth amendment's prohibition of cruel and unusual punishment in holding that lethal injection does not violate state constitution); *State* v. *Eady*, 249 Conn. 431, 443–48, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999) (following state and federal precedents in holding that evidence of crimes other than arson, when observed in plain view by fire officials lawfully on premises, may be seized without warrant without violating state constitution); *State* v. *Waz*, 240 Conn. 365, 379, 692 A.2d 1217 (1997) ("the overwhelming weight of federal and sister state authority supports the state's contention that a canine sniff examination of a mail parcel briefly detained upon reasonable and articulable suspicion does not run afoul of . . . privacy rights [protected under the state constitution]").

[38] The plain feel exception has been applied in several recent federal and state cases. E.g., *United States* v. *Raymond*, 152 F.3d 309, 312–13 (4th Cir. 1998); *United States* v. *Proctor*, 148 F.2d 39, 42–43 (1st Cir. 1998); *United States* v. *Rivers*, 121 F.3d 1043, 1046–47 (7th Cir.), cert. denied, 522 U.S. 1006, 118 S. Ct. 582, 139 L. Ed. 2d 420 (1997); *State* v. *Wonders*, 263 Kan. 582, 592, 952 P.2d 1351 (1998); *State* v. *Collard*, 286 Mont. 185, 194–96, 951 P.2d 56 (1997); *In re Interest of Andre W.*, 256 Neb. 362, 369, 590 N.W.2d 827 (1999); *Commonwealth* v. *Zhahir*, 561 Pa. 545, 565, 751 A.2d 1153 (2000).

of narcotics arrests and had handled crack cocaine approximately sixty to seventy times. His extensive experience dealing with narcotics, specifically cocaine, has educated him on the many forms of narcotics, how they look and feel and how they are packaged for sale and use. He also testified that he has had special training in narcotics detection, identification and transportation, and that, in his experience, drug dealers typically are armed. Murphy further testified that he conducted "[j]ust a patdown of [the defendant's] exterior clothing." When he *saw* the bulge in the defendant's sock, Murphy thought it could have been a weapon and continued the patdown search. When he *felt* the bulge in the defendant's sock, however, he "immediately recognized it to be that of freebase cocaine."[39] Murphy testified that the defendant was wearing shorts, making it possible to see and feel the bulge in the defendant's sock during the patdown without lifting a pant leg or touching the sock through a pant leg. In light of his extensive training

---

[39] Murphy testified as follows:

"[Assistant State's Attorney]: And when you patted him down, what did you mean by patting him down?

"[Murphy]: Just a patdown of his exterior clothing.

"Q. Okay. And what, if anything, did you find?

"A. A large amount of freebase cocaine.

"Q. And tell the court how that occurred.

"A. In patting [the defendant] down from upper body to his feet, I observed a large bulge in one of his socks, which I did not know what it was. It could have been a weapon. And upon touching the outside of it, I immediately recognized it to be that of freebase cocaine.

* * *

"Q. Now, you say, when you touched that bulge in the sock, you couldn't see the baggy at that point in time, is that correct?

"A. Yes.

"Q. Correct. But you immediately recognized it as crack?

"A. Yes.

"Q. How did you recognize it as crack?

"A. Being able to feel the plasticky packaging material and then the rock- or chunk-like substance.

"Q. And from your training and experience, that was crack cocaine?

"A. Yes."

and experience, it is perfectly plausible that Murphy would recognize, without further manipulation, the "plasticky packaging material" and the "rock- or chunk-like substance" known in the business to be crack cocaine. Therefore, we conclude that the trial court properly held that the seizure of the drugs found in the defendant's sock was valid under the plain feel exception.

## III

## SEARCH INCIDENT TO ARREST

We also conclude, based on the record, that Murphy had probable cause to arrest the defendant for possession of narcotics with intent to sell even before he searched for and seized the cocaine from the defendant's sock. We, therefore, consider whether the search that led to the seizure of the cocaine from the defendant's sock was constitutionally valid under the search incident to lawful arrest exception to the warrant requirement.

"Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable." *State* v. *Eady*, 249 Conn. 431, 436, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999); accord *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see also *State* v. *Miller*, 227 Conn. 363, 383, 630 A.2d 1315 (1993). The state bears the burden of proving that an exception to the warrant requirement applies when a warrantless search has been conducted. *State* v. *Eady*, supra, 436; see *Mincey* v. *Arizona*, 437 U.S. 385, 390–91, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *State* v. *Blades*, 225 Conn. 609, 618, 626 A.2d 273 (1993).

It is well established, however, that a warrant is not required when a search is conducted incident to a lawful custodial arrest. E.g., *New York* v. *Belton*, 453 U.S. 454,

457, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981); *United States* v. *Robinson,* 414 U.S. 218, 224, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973); *Chimel* v. *California,* 395 U.S. 752, 762–63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); *State* v. *Trine,* supra, 236 Conn. 235; *State* v. *Delossantos,* supra, 211 Conn. 266; *State* v. *Badgett,* 200 Conn. 412, 424, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). When an arrest is made, it is reasonable for a police officer to search for, and seize, any weapons or evidence within the immediate control of the arrested person in order to ensure officer safety and prevent the destruction or concealment of evidence. *Chimel* v. *California,* supra, 762–63; see *State* v. *Dukes,* 209 Conn. 98, 122–23, 547 A.2d 10 (1988).

In order for a warrantless felony arrest to be valid, it must be supported by probable cause. *State* v. *Trine,* supra, 236 Conn. 236; see *State* v. *Dennis,* 189 Conn. 429, 431, 456 A.2d 333 (1983). "The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a 'totality of circumstances' test." *State* v. *Velasco,* 248 Conn. 183, 189–90, 728 A.2d 493 (1999), citing *Illinois* v. *Gates,* 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); see also *State* v. *Barton,* 219 Conn. 529, 544–45, 594 A.2d 917 (1991). "Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed." (Internal quotation marks omitted.) *State* v. *Trine,* supra, 236–37. "The probable cause test then is an objective one." (Internal quotation marks omitted.) Id., 237.

"We consistently have held that [t]he quantum of evidence necessary to establish probable cause exceeds

mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Eady*, supra, 249 Conn. 439–40; see also *State* v. *Trine*, supra, 236 Conn. 237; *State* v. *Munoz*, 233 Conn. 106, 135–36, 659 A.2d 683 (1995). "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause." (Internal quotation marks omitted.) *State* v. *Eady*, supra, 440, quoting *State* v. *Diaz*, 226 Conn. 514, 541, 628 A.2d 567 (1993).[40]

In reviewing a trial court's determination that probable cause to arrest existed, we consider "whether [it is] legally and logically correct and whether [it] find[s] support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, supra, 246 Conn. 553. "Because a trial court's determination of the existence of probable

[40] The United States Supreme Court has endorsed an objective standard, noting that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." (Internal quotation marks omitted.) *State* v. *Eady*, supra, 249 Conn. 441, quoting *Horton* v. *California*, 496 U.S. 128, 138, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

cause implicates a constitutional claim, we must review the record carefully to ensure that its determination [is] supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 238.

We conclude that probable cause existed to arrest the defendant for possession of narcotics with intent to sell in violation of § 21a-278 (b). The defendant entered a private residence, unannounced, in the middle of the execution of a search warrant. As we recognized in *Trine*, it was reasonable for Murphy to conclude that "the occupants of that residence . . . likely [were] involved in drug trafficking . . . ." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 241. Murphy reasonably could infer that the defendant, who identified himself as Mark Clark, was Han's supplier described in the search warrant affidavit and implicated in the letter seized from Han's apartment. Moreover, the defendant entered Han's apartment immediately after the police had determined that Han's supply of drugs had been exhausted, and the defendant became visibly nervous when he learned that narcotics officers were executing a search warrant. The bulge in the defendant's sock added to the officer's suspicions that the defendant was either carrying a weapon or was in the process of committing a felony.

Concluding that the arrest itself was supported by probable cause, therefore, we also conclude that the search of the defendant's sock and the seizure of cocaine therefrom were sufficiently contemporaneous with his arrest so as to qualify as an integral part thereof.[41] Id., 242. Once Murphy had probable cause to

---

[41] "[A] formal arrest need not always chronologically precede the search [incident to lawful arrest] in order for the search to be valid. Where there is probable cause to arrest, a search before an arrest is reasonable under the fourth amendment as long as the arrest and search and seizure are substantially contemporaneous, and are integral parts of the same incident." (Internal quotation marks omitted.) *State* v. *Velasco*, 47 Conn. App. 424, 428, 707 A.2d 286 (1998), aff'd, 248 Conn. 183, 728 A.2d 493 (1999); see also *Rawlings* v. *Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633

believe that the defendant was committing a felony, he had authority to place him under arrest pursuant to § 54-1f (b). See footnote 25 of this opinion. Thereafter, Murphy had the authority to conduct a full search of the defendant incident to that arrest. In its decision, the trial court explicitly found that, "[u]pon touching the object in the [defendant's] sock with his hand, [Murphy] immediately recognized it [not as a weapon, but] as crack cocaine . . . based upon the feel of the plastic packaging material and the rock chunk-like substance." Murphy was not required to "turn a blind eye to what he had probable cause to believe was a crime being committed in his presence" simply because the search revealed illegal narcotics rather than a weapon. *State* v. *Trine*, supra, 236 Conn. 242.

We conclude that, based on the foregoing evidence, Murphy properly seized the cocaine during a search incident to a lawful arrest. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other justices concurred.

(1980); *State* v. *Waller*, 223 Conn. 283, 292, 612 A.2d 1189 (1992); *State* v. *Federici*, 179 Conn. 46, 54–55, 425 A.2d 916 (1979).