******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOE BALTAS
(AC 37921)

Lavine, Mullins and Bishop, Js.

*Argued September 13—officially released November 1, 2016*

(Appeal from Superior Court, judicial district of New Haven, geographical area number seven, Klatt, J.)

*Cameron R. Dorman*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, former state's attorney, and *Robert F. Mullins*, *Sr.*, assistant

state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Joe Baltas, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and one count of possession of a dangerous instrument in a correctional institution in violation of General Statutes § 53a-174a. The defendant claims that the trial court abused its discretion in denying his motion to suppress an incriminating statement he made to a correction officer because he allegedly was subjected to a custodial interrogation without the benefit of having been advised of his constitutional rights pursuant to *Miranda*.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant was an inmate at the Cheshire Correctional Institution in the north block five housing unit (unit). The cells in the unit surround a recreation day room. A set of stairs in the recreation room leads up to a second tier of cells. Tables line the opposite ends of the room, leaving an open center aisle in the middle. Surveillance cameras in the unit can zoom in if there is a disturbance in the room.

On January 7, 2014, Correction Officer Richie Johnson was on duty in the recreational room, where he was assigned to sit at the desk in "the bubble," an observational area from which a guard controls the operation of cell and shower doors. The bubble is some forty feet from the bottom of the stairwell. At approximately 11:07 a.m., Joseph Murphy, an inmate, began to berate the defendant. Johnson and his partner told the defendant and Murphy to stop arguing, and Murphy stopped yelling at the defendant. At approximately 11:18 a.m., Murphy was talking to another inmate at the bottom of the stairwell when the defendant approached him. The defendant and Murphy "exchanged words," and the defendant grabbed a shank, a sharp piece of metal, from his waistband. He stabbed Murphy with the shank three times. The two then engaged in a physical altercation and rolled across the floor to the opposite end of the room. The defendant dropped the shank in the middle of the recreation room.

As soon as Johnson saw the defendant pull the shank from his waistband, Johnson announced a code blue, which is a warning to the other staff members that there is an inmate-on-inmate altercation. Johnson stated that a weapon had been used. As Johnson waited for additional correction personnel to arrive, he remained at the bubble and directed the other inmates to secure themselves in their cells. Most of the inmates complied, but a few remained in the recreation room. Only one other inmate other than the defendant and Murphy approached the center aisle where Johnson saw the shank.

Approximately seven seconds after the defendant stabbed Murphy, correction officers arrived and restrained Murphy on the left side of the room and the defendant on the right side of the room. After the defendant and Murphy were separated, Johnson indicated with a beam of light from a flashlight where the shank was located on the floor. Correction Officer Brian Avery picked up the shank and put it in a bag.

Lieutenant Felipe Lugo responded to the scene as soon as Johnson announced the code blue. When he arrived, Murphy and the defendant were restrained at opposite sides of the room. Lugo observed Mace on the defendant, which is normally sprayed on an inmate if he is involved in a physical altercation. Soon thereafter, Murphy was taken to the restrictive housing unit, where Lugo observed wounds on him five to ten minutes after the altercation occurred. A nurse treated Murphy for the wounds with a tetanus shot.

Lugo and other staff members escorted the defendant to the restrictive housing unit where he was decontaminated to remove the Mace. While he was in hand restraints, the defendant was strip-searched, evaluated by medical personnel, and put in a cell separate from the other inmates. Once the defendant was put in a cell, Lugo gave him the opportunity to make a written statement about the incident. The defendant declined to give a written statement or to press charges against Murphy. Lugo then asked the defendant whether he owned the shank, and the defendant admitted that he did.

The defendant was arrested and charged with one count of assault in the second degree and one count of possession of a dangerous instrument in a correctional institution. On August 25, 2014, the defendant filed a motion to suppress the incriminating statement he made to Lugo, claiming that he was subjected to a custodial interrogation without being read his *Miranda* rights. The trial court denied the motion. On October 24, 2014, the jury found the defendant guilty on both counts. This appeal followed. Additional facts will be set forth as needed.

The defendant claims that the trial court abused its discretion in denying his motion to suppress evidence. Specifically, the defendant argues that the trial court should have suppressed the incriminating statement he made to Lugo because Lugo subjected the defendant to a custodial interrogation "while [he was] detained in a cell within the restrictive housing unit," and therefore, he was entitled to be informed of his constitutional right against self-incrimination. The defendant argues that the admission of the statement was not harmless error because the statement was essential to proving the charges against him. The state argues that there is "nothing in the record to support a conclusion that the

defendant's removal from [the unit] and placement in another restrictive housing unit" subjected him to a custodial interrogation. Because we conclude that the admission of this evidence was harmless beyond a reasonable doubt, we do not reach the question of whether the defendant was subjected to a custodial interrogation.

We set forth the applicable standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

"If statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010).

Assuming, arguendo, that the defendant was subjected to a custodial interrogation, and thus, should have been advised of his rights under *Miranda*, we conclude, on the basis of our review of the entire record, that admission of the defendant's statement into evidence was harmless beyond a reasonable doubt.

The state presented sufficient evidence of the defendant's guilt beyond a reasonable doubt apart from the defendant's statement. Johnson, an eyewitness to the events, testified that he observed the defendant approach Murphy, pull a shank from his waistband, and stab Murphy with the shank three times. Johnson also

observed the shank fall out of the defendant's hands when the defendant and Murphy were fistfighting.[2] The shank was found in the center aisle of the room, and the only inmates whom Johnson observed in the middle of the room during the incident were the defendant and Murphy. In short, there was no evidence whatsoever that the victim, or a third party, ever possessed the shank.[3]

Lugo testified that when he arrived in the recreation room, the defendant was restrained by multiple officers and was covered with Mace residue, indicating that the defendant was involved in an altercation. Lugo also testified that he observed Murphy's injuries when he saw him in the restrictive housing unit five to ten minutes after the stabbing occurred.

Through the testimony of Michael Desena, a nurse supervisor at the correctional facility, the state introduced into evidence the medical incident reports as to both the defendant and Murphy. Murphy's medical incident report indicated that he suffered from bleeding cuts on his skin that were treated with a tetanus shot. The defendant's medical incident report indicated that he did not sustain any injuries.

The state introduced into evidence a number of pieces of physical evidence that were indicative of the defendant's guilt, including the shank Johnson saw the defendant use to stab Murphy. The state also introduced into evidence photographs of Murphy's injuries. The photographs were taken within twenty to thirty minutes of the altercation, and the injuries displayed were consistent with the injuries Lugo observed.

Finally, the state introduced into evidence a videotape that depicted the entire incident between the defendant and Murphy. The videotape showed the defendant striking Murphy before the two engaged in the fistfight. Moreover, Johnson testified that the images on the videotape were consistent with what he observed, and Lugo identified the perpetrator in the video as the defendant. The videotape also showed Avery recover an object from the middle of the floor. Considering all of the evidence, the only reasonable explanation for what occurred is the one proffered by the state. Accordingly, even if we were to assume that the trial court's failure to grant the defendant's motion to suppress was an error, in light of the evidence before the jury, any such error would be harmless beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] During direct examination, Johnson testified, in part, as follows: "[The defendant] reached in his waistband and grabbed a sharp object, a shank, a sharpened piece of metal. He—he—he struck inmate Murphy in the elbow a few times. A few times he struck. . . . [A]fter the stabbing, the weapon,

the shank, fell out of the hands of [the defendant]. It fell on the floor, and I used the flashlight to light it up so whenever responding staff came, they can actually see it . . . ."

[3] Although the videotape of the altercation showed that a third inmate approached the area where the shank was found, the video did not indicate that he bent down to drop the shank or do anything else to suggest that he possessed the shank at any time.