## STATE OF CONNECTICUT *v.* MARCUS GREGORY
### (AC 22337)

West, Landau and McDonald, Js.

Argued September 25—officially released December 24, 2002

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *John C. Smriga*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Marcus Gregory, appeals from the judgment of conviction rendered upon his entering conditional pleas of nolo contendere to two counts of kidnapping in the first degree in violation

of General Statutes § 53a-92 (a) (2), one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and one count of burglary in the second degree with a firearm in violation of General Statutes § 53a-102a (a). In his conditional plea, the defendant reserved the right to appeal from the denial of his motion to suppress seized evidence. See Practice Book § 61-6 (2). We affirm the judgment of the trial court.

After an evidentiary hearing on the motion to suppress, the court found the following facts in its memorandum of decision. "In the early morning hours of January 10, 1997, Troopers Edward Wooldridge and Richard Gregory of the state police were 'backing up' another trooper who was engaged in a stop of a suspected drunken driver on the Route 25 connector in Bridgeport. At approximately 1:53 a.m., they observed a red Subaru station wagon operated by a black male with no apparent passengers traveling southbound on the connector without headlights on. Trooper Wooldridge, who was already in his cruiser, immediately pursued the vehicle with emergency lights and siren activated for a short distance, pulling within one-half car length of the vehicle, where he managed to obtain the license plate number and reported that via radio to the Troop G dispatcher.

"At exit one, the vehicle abruptly exited the highway after the driver attempted an evasive maneuver, driving over an area between the highway and the exit ramp. At the bottom of the exit ramp, the vehicle took a right onto Prospect Street, then made a right turn onto Park Avenue heading north. After traveling a short distance, the vehicle appeared to be making a U-turn at the intersection of Hancock and Park Avenues. At this point, the driver jumped out of the vehicle while the vehicle continued down Hancock Avenue until it came to rest

after striking a parked vehicle. The driver began running southbound on Park Avenue. Trooper Wooldridge attempted to observe the driverless car heading down Hancock Avenue as well as the driver running down Park Avenue at the same time.

"Wooldridge then reversed his direction and traveled southbound on Park Avenue, and began to travel the perimeter of the block consisting of Park Avenue, Cottage Street, Seeley Street and Hancock Avenue in an attempt to locate the driver of the vehicle. During this search, Wooldridge was informed by the Troop G dispatcher that the vehicle was registered to a white male from Ansonia. As Wooldridge began traveling back toward Park Avenue on Hancock Avenue, Trooper Gregory arrived in the area. While looking in his rearview mirror, Wooldridge observed a person appear from an alleyway and then disappear. This alleyway, formed by 91 and 99 Hancock Avenue, is approximately ten feet wide and is divided down its length by a chain-link fence. It is approximately four or five houses away from where the Subaru came to rest after being abandoned. Trooper Gregory, along with Trooper Wooldridge, walked down the alleyway along 91 Hancock Avenue, searched the backyard area, found nothing and returned to the street.

"At this point, the two troopers were joined by Officer Orlando Lanzante, a Bridgeport police officer. At Lanzante's suggestion, the three returned to the backyard in an effort to locate the driver of the Subaru. On their way back to the street from the backyard, Lanzante noticed the defendant hiding next to a couch, which was standing on end against 91 Hancock Avenue, an abandoned building. The officers had walked by this couch on their way into the backyard both prior to and after the arrival of Lanzante, and although the two troopers were carrying flashlights, the defendant remained unnoticed. Upon being seen by Lanzante, [the

defendant] was ordered at gunpoint several times to get on the ground and he failed to comply. He was then physically placed on the ground by Trooper Gregory and handcuffed behind his back. The area where this confrontation took place was closely confined by the house, couch and chain-link fence. After being hand-cuffed, the defendant was then assisted to his feet and led out to the street to the rear of Lanzante's cruiser where the lighting conditions were better.

"The defendant initially denied any wrongdoing. As he was being led out of the alleyway, he indicated that he had been smoking marijuana and was attempting to avoid the police for that reason. All three officers testified that they did not observe anyone else on the street prior to the detention of the defendant. Trooper Wool-dridge indicated that he did not smell the odor of mari-juana in the area. The defendant also was unable to produce any form of identification.

"At the rear of Lanzante's cruiser, the defendant was patted down by Wooldridge to determine if he had any weapons in his possession. Wooldridge found no weap-ons, but testified that in the course of the patdown, he felt what he believed to be a plastic bag with some substance in it in the right front pants pocket of the [defendant]. Upon removing the item from the pocket, Wooldridge discovered a plastic bag containing a green, plant-like substance, which he believed to be marijuana. At that time, Wooldridge considered the defendant to be under arrest and read him his rights. He was then placed into the back of Lanzante's police cruiser. Approximately five minutes had elapsed from the time the Subaru was first seen on the Route 25 connector until the time that the defendant was placed into the cruiser.

"Within minutes, [Wooldridge] began to receive addi-tional information from [his] dispatcher relating to the

vehicle, including the fact that the car was recently stolen from Ansonia and may have been involved in a home invasion and sexual assault, which had occurred in that city approximately twenty minutes earlier. After being informed that a Derby class ring had been stolen in the Ansonia robbery, the troopers recalled that they had seen a Derby class ring in the possession of the [defendant] when they seized the marijuana and had returned it to him. The troopers then took the [defendant] out of the vehicle to look for the ring. The defendant no longer had possession of the ring, but it was located under the seat cushion of the police vehicle, where he had been sitting. The troopers found that the ring bore the initials of the victim of the Ansonia robbery. The red Subaru was packed with items that matched those reportedly stolen in the Ansonia robbery.

"Wooldridge had broadcast a description over the radio immediately after catching a fleeting glimpse of the [driver] as he ran away from him. Wooldridge initially described the driver as a black male with gray pants and a black jacket. Shortly thereafter, when asked by his radio dispatcher to repeat his description, [Wooldridge] responded: 'Black male in a gray jacket, black hoody, gray pants, short hair, they look like black sneakers.' When the defendant was found hiding in the couch, he was wearing a black hoody, blue jeans and dark brown shoes. His hair was almost shoulder length and was worn in thinly stranded, tight braids. The defendant, however, appeared to be the same race, about the same height, the same overall build and was wearing the same kind of black hoody that Wooldridge had seen earlier under a jacket. [Wooldridge] further noted that the color of the blue jeans was not clearly distinguishable from gray when viewed under streetlights.

"Since Wooldridge perceived differences in the appearance of the [defendant] compared to what he

recalled seeing as the man from the Subaru, efforts were initiated to bring a dog capable of tracking human scent to the scene in order to attempt to track the path of the driver of the vehicle. The officers tried to locate an available K-9 unit through the state police and then through the West Haven police department. Eventually, at 2:20 a.m., Officer Robert Novia of the Bridgeport police department was summoned from his home. At 2:35 a.m., he arrived at the scene on Hancock Avenue with his dog, Timmy, approximately thirty-seven minutes after the defendant was originally detained. After meeting with the officers at the scene, the dog began his track from the front seat of the abandoned Subaru and followed an apparent scent trail down Hancock Avenue, which eventually led to the area of the couch where the defendant had been discovered. Officer Novia testified that in his opinion, the driver of the Subaru, after leaving the vehicle, eventually went to the couch, where a 'pool scent' was left, indicating that the driver had been standing in that particular location.

"As a result of the investigation which followed the original detention of the defendant, he was arrested for possession of marijuana and for various charges, including robbery, burglary and sexual assault relating to the Ansonia home invasion. A search warrant including information obtained by this investigation was obtained for a sample of the defendant's blood. A subsequent DNA analysis and comparison of the defendant's blood led the police to conclude that the defendant was responsible for a sexual assault that had occurred in Bridgeport several days prior to the Ansonia incident. The defendant was arrested . . . . Also, the boots [that the defendant] was wearing at the time of his arrest were subsequently matched with footprints found at the scene of a robbery for which the defendant was arrested."

The defendant was charged with kidnapping in the first degree, sexual assault in the first degree and burglary in the first degree in relation to crimes that occurred in Bridgeport on January 6, 1997, and kidnapping in the first degree and burglary in the second degree with a firearm in relation to crimes that occurred in Bridgeport on January 5, 1997. Upon his conviction, the defendant was sentenced to a total effective term of 100 years imprisonment to run concurrently with the ninety year sentence he was serving as a result of his conviction arising out of the crimes that occurred in Ansonia.[1]

The defendant had sought to suppress the blood and boot print evidence, claiming that they were the fruits of an illegal search. He contended that because the police did not have a warrant or probable cause to arrest him, nor did they have a reasonable and articulable suspicion to conduct a *Terry*[2] stop, his seizure was improper and any evidence that resulted, his DNA and the boot print, should have been suppressed.

The court found that the defendant's arrest was proper because there was probable cause to support an arrest for the motor vehicle offenses. In the alternative, the court found that there were sufficient facts for the police to detain the defendant temporarily for investigative purposes and to conduct a patdown, which revealed that the defendant had a bag of marijuana in his pocket and supported his arrest for drug possession.

The crux of the defendant's argument rests on his proposition that the court improperly determined that there was probable cause or, in the alternative, a reasonable and articulable suspicion, that he was the driver of the Subaru station wagon. Although the defendant

---

[1] For a description of those crimes, see State v. Gregory, 56 Conn. App. 47, 741 A.2d 986 (1999), cert. denied, 252 Conn. 929, 746 A.2d 790 (2000).

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

concedes that the police had probable cause to stop the driver of the station wagon, he claims that at the time the police first encountered him in the alley, they had no justification either to arrest him or to conduct a temporary stop. We disagree.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"Because a trial court's determination of the validity of a [*Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] patdown search implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279–80, 764 A.2d 1251 (2001); see *State* v. *Gregory*, 56 Conn. App. 47, 51–52, 741 A.2d 986 (1999), cert. denied, 252 Conn. 929, 746 A.2d 790 (2000).

"Under the fourth amendment to the United States constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest.

. . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75–76, 779 A.2d 88 (2001).

The court concluded that the police had the authority to detain the defendant temporarily when they found him hiding in the alley. In determining the legality of a *Terry* stop, we do not look at each fact in isolation, but at the totality of the circumstances presented to the police at the time they detain an individual. *State* v. *Gregory*, supra, 56 Conn. App. 52. On the basis of the totality of the circumstances presented to the officers and applying an objective standard, we agree with the court's conclusion that the officers had a reasonable and articulable suspicion.

"The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time

of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness." (Internal quotation marks omitted.) *State* v. *Wylie*, 10 Conn. App. 683, 687, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987). "Proximity in the time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Internal quotation marks omitted.) *State* v. *DaEria*, 51 Conn. App. 149, 158, 721 A.2d 539 (1998).

After a careful review of the record, we conclude that the court's factual findings were supported by substantial evidence. The court found that when Wooldridge attempted to stop the driver of a Subaru station wagon being operated at night without its headlights turned on, the driver did not stop. The trooper began a chase, using his cruiser's siren and flashing lights, which ended in Bridgeport when the driver jumped from the still moving vehicle and ran. When the trooper began searching the area for the driver, a person appeared in an alleyway and then disappeared. The alleyway was four or five houses away from the location where the Subaru came to rest. After once searching that alleyway with another trooper and not finding anyone, the troopers were joined by a Bridgeport police officer, and, in a second search, found the defendant hiding behind a couch next to an abandoned building. The defendant was found there less than five minutes after the car chase began at 2 a.m. He was alone in the alley and without a coat in midwinter. Furthermore, when discovered, the defendant refused to abide by the officers' requests to get on the ground. Considering the facts together, the officers were justified in temporarily detaining the defendant.

The defendant argues that because the clothing description that Wooldridge provided to his radio dispatcher differed from what the defendant was wearing

when he was found in the alley, the police had no basis to conclude that he was the driver of the vehicle. When Wooldridge saw the driver fleeing, he reported that the driver had short hair and was wearing gray pants, black sneakers, a gray jacket and a black hooded sweatshirt. The defendant was found wearing jeans, brown boots, a black hooded sweatshirt and with a tightly braided cornrow hairstyle. Wooldridge testified that the physical characteristics of the individual he saw fleeing the scene matched the defendant's physical characteristics. The officer wanted to determine if the defendant was the driver of the vehicle. That was a proper goal of a *Terry* stop. The courts have pointed out that the purpose of a *Terry* stop is to investigate whether a suspect committed, or was in the process of committing, a criminal offense. See *Terry* v. *Ohio*, supra, 392 U.S. 1. As our Supreme Court has stated, the purpose of the stop is to "confirm or dispel [the officer's] suspicions [that an individual has committed or is about to commit a crime]." *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992).

The police are therefore not required to confirm every detail of a description of the perpetrator before that person can be detained. *State* v. *DaEria*, supra, 51 Conn. App. 158. Rather, "[w]hat must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." (Internal quotation marks omitted.) Id. Wooldridge's description came after he saw the defendant jumping from a moving vehicle at 2 a.m. Given the limited amount of time that Wooldridge had to view the driver and the lack of lighting in the area, combined with the fact that the description provided was similar, although not identical, to what the defendant was found wearing,

and that the defendant's physical characteristics were the same as the individual Wooldridge saw fleeing the vehicle and the circumstances under which the defendant was found, we conclude that there was a reasonable and articulable suspicion for the police to detain him.[3]

Having found that the police properly stopped the defendant, we now turn to the propriety of the patdown search that followed. It is the defendant's contention that because Wooldridge testified that when he patted the defendant down, he was searching for drugs, as well as weapons, the search exceeded the scope of a patdown under *Terry*. We disagree.

If an officer possesses a reasonable suspicion that the individual stopped is in possession of a weapon, the officer may conduct a patdown frisk. See *Ybarra* v. *Illinois*, 444 U.S. 85, 93, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979). We again use an objective standard in determining whether a police officer had a particularized basis for suspecting whether an individual should be patted down for weapons. See *State* v. *Clark*, supra, 255 Conn. 282. "When conducting a patdown search of a suspect, the officer is limited to an investigatory search for weapons in order to ensure his . . . own safety and the safety of others nearby. . . . The officer cannot conduct a general exploratory search for what-

---

[3] We reach that conclusion without the need to consider the defendant's statement to the police that he was hiding in the alley to smoke marijuana, which would strengthen the suspicion. The defendant now claims on appeal that this statement was elicited by the police in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He did not, however, raise that issue before the trial court. The absence of any finding by the court as to the circumstances surrounding the statement prohibits review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Furthermore, the police may ask some questions during a *Terry* stop without giving *Miranda* warnings. See *Berkemer* v. *McCarty*, 468 U.S. 420, 439–40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *State* v. *Gregory*, supra, 56 Conn. App. 53–54.

ever evidence of criminal activity [he] might find." (Citations omitted; internal quotation marks omitted.) Id. However, "[i]n order to justify the reasonableness of an investigatory search, [an] officer need not be absolutely certain that [an] individual is armed; [rather] the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his . . . safety or that of others was in danger." (Internal quotation marks omitted.) Id., 284–85.

In *State* v. *Gregory,* supra, 56 Conn. App. 47, we stated: "During a *Terry* detention, the police may conduct a pat-down search to locate weapons if they reasonably believe that the suspect may be armed and dangerous. . . . According to *Terry* v. *Ohio,* [supra, 392 U.S. 20–27], where a reasonably prudent officer is warranted in the circumstances of a given case in believing that his safety or that of others is endangered, he may make a reasonable search for weapons of the person believed by him to be armed and dangerous regardless of whether he has probable cause to arrest that individual for a crime or the absolute certainty that the individual is armed. Once a reasonable and articulable suspicion exists, an officer may detain a suspect to conduct an investigative stop to confirm or dispel such suspicions. Suspicious conduct during a *Terry* stop, including flight at the approach of officers and a *refusal to comply with officers' instructions,* are other integral factors that will justify a pat-down for weapons. . . .

"To determine whether an investigatory detention and pat-down are permissible a two part inquiry is utilized: (1) was the officer justified in initially detaining the individual based on specific and articulable facts; and (2) did specific and articulable facts exist that suggested that the individual presented a harm to the officers or others so as to justify the pat-down. . . . The wanton and reckless conduct by the defendant to avoid

detection by the police suggests a strong consciousness of guilt." (Citations omitted; emphasis added.) *State* v. *Gregory*, supra, 56 Conn. App. 52–53.

Although Wooldridge testified that he also was searching for drugs when he patted the defendant down, he also testified that he was searching for a weapon. The fact that Wooldridge stated that he also was searching for drugs does not invalidate the officers' conduct. The officers were searching for an individual who fled a car that was being driven without its headlights on after ignoring the police siren and flashing lights of the police cruiser following him. Rather than stop for the pursuing cruiser, the driver, whose description did not match that of the vehicle's owner, leaped from the moving vehicle and ran from the scene. That vehicle then crashed into a parked vehicle. When the police encountered the defendant, who generally matched the driver's description, hiding in a nearby dark alley at 2 a.m. next to an abandoned building, he refused to adhere to repeated requests by the police to get on the ground. We conclude that the defendant's headlong and reckless flight from the police, considered with his hiding in a darkened alley near abandoned buildings, justified the patdown. Viewed by the objective standard we apply, a reasonably prudent person would have been warranted in the belief that either his safety, or the safety of others, was in jeopardy. See id., 52.

"In *Minnesota* v. *Dickerson* [508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993)], the United States Supreme Court established the plain feel exception to the warrant requirement, as a matter of federal constitutional law. Under *Dickerson*, a police officer acting without a warrant may seize contraband that the officer detected through the sense of touch during a lawful patdown search. . . . Specifically, the United States Supreme Court held that, [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object

whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Clark*, supra, 255 Conn. 287–88. We conclude that Wooldridge properly seized the marijuana in the defendant's possession when he recognized its presence during the patdown search. Accordingly, we conclude that Wooldridge's patdown of the defendant and the seizure of the marijuana were proper.

The defendant also argues that the officers' use of drawn guns and handcuffs went beyond their authority under *Terry*. In appropriate circumstances, however, the police may take such reasonable steps during a *Terry* investigative stop to protect themselves. See *State* v. *Wilkins*, 240 Conn. 489, 495–504, 692 A.2d 1233 (1997); *State* v. *Casey*, 45 Conn. App. 32, 41–44, 692 A.2d 1312, cert. denied, 241 Conn. 924, 697 A.2d 360 (1997); *United States* v. *Jordan*, 232 F.3d 447, 449–50 (5th Cir. 2000); *United States* v. *Vega*, 72 F.3d 507, 515–16 (7th Cir. 1995), cert. denied sub nom. *Early* v. *United States*, 518 U.S. 1007, 116 S. Ct. 2529, 135 L. Ed. 2d 1053 (1996); *Allen* v. *Los Angeles*, 66 F.3d 1052, 1056–57 (9th Cir. 1995); *United States* v. *Alexander*, 907 F.2d 269, 272–73 (2d Cir. 1990), cert. denied, 498 U.S. 1095, 111 S. Ct. 983, 112 L. Ed. 2d 1067 (1991).

The court also found that there was probable cause to arrest the defendant as the driver of the vehicle who had refused to stop when pursued by a police vehicle and fled the scene as the car crashed driverless into another vehicle. We need not consider that conclusion because, upon finding the marijuana during the patdown of the defendant, the officers had independent

probable cause to arrest him for possession of a controlled substance. Following the defendant's arrest, the officers also found the Ansonia victim's ring that had been concealed by the defendant in the backseat of the police cruiser. Additionally, in the victim's stolen Subaru station wagon, the officers found the remainder of the property that had been stolen from the Ansonia victim. That also constituted probable cause.

The judgment is affirmed.

In this opinion the other judges concurred.