******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DEMETRICE LEWIS
(AC 38087)

DiPentima, C. J., and Beach and Bishop, Js.

*Argued March 16—officially released June 20, 2017*

(Appeal from Superior Court, judicial district of New Haven, Cradle, J. [motion to suppress]; Keegan, J. [judgment].)

*Laila M. G. Haswell*, senior assistant public defender, with whom, on the brief, was *Lauren Weisfeld*, chief of legal services, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Karen A. Roberg*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Demetrice Lewis, appeals from the judgment of conviction after the court's denial of his motion to suppress evidence in which he sought to suppress the introduction of a pistol found on his person by a police officer. Following the denial of his motion, the defendant entered conditional pleas of nolo contendere to the offenses of carrying a pistol without a permit and criminal possession of a pistol. Subsequently, the court rendered a judgment of conviction and sentenced the defendant to ten years of incarceration, execution suspended after one year, followed by a three year conditional discharge. On appeal, the defendant claims that the court erroneously denied his motion to suppress the pistol because it was obtained from him in violation of his constitutional rights against unlawful search and seizure. We affirm the judgment of the trial court.

The following background facts and procedural history are relevant to our consideration of the issues on appeal. On May 28, 2013, in a short form information, the defendant was charged with carrying a pistol without a permit in violation of General Statutes § 29-35 (a), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). These charges were restated in a long form information dated January 9, 2015. Thereafter, on February 19, 2015, the defendant filed a written motion to suppress evidence on the basis of his claim that any evidence taken from him had been unlawfully seized during an unlawful stop and ensuing search of his person by Officer Milton DeJesus.

On October 24, 2014, following an evidentiary hearing on the defendant's motion to suppress at which DeJesus testified, the trial court, *Cradle, J.*, issued a written memorandum of decision in which it found the following facts, all of which find substantial support in the evidentiary record: "On the evening of May 24 and into the early morning hours of May 25, 2013, Officer DeJesus of the New Haven Police Department was assigned to patrol the area of district four in New Haven. District four encompasses the area of Chapel Street and Derby Avenue, which is known for its problems with drug sales and prostitution. At approximately 4:20 a.m., officers were dispatched to 36 Derby Avenue in response to a report of a domestic disturbance. The call from dispatch indicated that a female had reported that she had been choked by an individual named 'Antoine' who had fled the residence. The caller indicated that she believed she heard 'Antoine' outside in the bushes. Dispatch described the perpetrator as a black male dressed in all black. Officer DeJesus was working alone that evening, in uniform, in a marked patrol vehicle. At the time of the call, he was in the

area of Whalley Avenue, approximately one quarter mile from 36 Derby Avenue and was the only officer nearby. Being in close proximity, he was able to respond to the call and proceeded to 36 Derby Avenue. Approximately one minute after receiving the call from dispatch, while en route to 36 Derby Avenue, he approached the corner of Chapel Street and Derby Avenue and spotted the defendant, a black male, in dark clothing in the driveway to the right of 1494 Chapel Street, which is almost at the corner of Chapel Street and Derby Avenue. The location where the defendant was standing is less than a one minute walking distance from 36 Derby Avenue, and in close proximity to 1494 Chapel Street.

"Based on the testimony provided by Officer DeJesus and photographs taken after his arrest, although the defendant was not wearing all black when he was apprehended, he was wearing dark clothing more specifically, dark blue jeans, a dark grey jacket, and a navy blue skull cap. Officer DeJesus testified, however, that due to the heavy rain that evening, the defendant's clothing appeared to be 'all black' when he first spotted the defendant. When Officer DeJesus first identified the defendant on the corner of Chapel and Derby, he was standing alone, in the pouring rain and appeared to be talking on a cell phone. At that hour of the morning it was dark, and the area was only lit by a street lamp that illuminated the street onto the sidewalk area. Although Officer DeJesus could see the defendant, the area was not well lit. Given the circumstances and the nature of the clothing the defendant was actually wearing, he matched the general description provided by dispatch of the suspect in the domestic violence incident.

"Observing the defendant and believing him to match the description of the suspect, Officer DeJesus stopped his patrol vehicle on the left side of the Chapel-Derby intersection about fifteen to twenty feet away from the defendant to investigate further. While seated within his patrol vehicle, Officer DeJesus rolled down the window and inquired, 'yo my man, what's your name?' The defendant did not respond or acknowledge Officer DeJesus in any way. Officer DeJesus then exited his patrol vehicle to investigate further. As he approached the defendant, he attempted to engage the defendant in a dialogue to determine who he was and what he was doing in the area. He asked for his name and identification but the defendant did not give a coherent answer and was 'just . . . mumbling back' and 'trying to make words, but not being clear or concise . . . .' Based upon the defendant's conduct [and] appearance, Officer DeJesus believed the defendant to be intoxicated and/or under the influence of drugs. The officer approached the defendant at an angle, so as not to appear confrontational, and again asked for the defendant's name. The defendant mumbled what sounded like 'Michael,' and continued to appear to talk on his cell phone.

"Officer DeJesus observed that the defendant was 'not . . . staying stable,' and kept 'swaying' and 'moving around.' He noted the defendant's 'eyes were not right' and that he was not acting normal. The officer further described the defendant's stance as 'guarded.' When Officer DeJesus asked the defendant where he was coming from, the defendant muttered, 'I'm in a program.' On the basis of his training and experience, Officer DeJesus deduced that because (1) the defendant fit the description of the suspect wanted in connection with a violent domestic assault in that area, (2) the defendant acted in a guarded and evasive manner, and (3) individuals under the influence of alcohol or narcotics are more likely to be violent or aggressive, a patdown of the defendant was warranted for officer safety.

"Officer DeJesus approached the defendant and conducted a brief patdown that he described as a 'sweep' for weapons. The entire encounter lasted less than one minute. During the course of the patdown, the defendant dropped his hand toward his side at which point Officer DeJesus told him 'no, hold on a second.' Officer DeJesus simultaneously reached for the defendant's waistband and felt the butt end of a firearm. He then removed a nine millimeter handgun from the defendant's waistband. Upon removing the gun, the defendant initiated a struggle for the weapon and the two wrestled for a brief moment, ultimately rolling into the street. In the interim, responding officers arrived on the scene and were able to subdue the defendant with the assistance of a canine. The defendant was then arrested and taken into custody."

In denying the defendant's motion to suppress, the trial court concluded first that the police officer had not seized the defendant at the moment he stopped his patrol car nearby the defendant, but rather later, after DeJesus had approached the defendant and physically touched him. The court found: "When Officer DeJesus first approached the defendant in his police cruiser, he stopped fifteen to twenty feet away from him. He did not activate his lights or sirens, and he did not use any language that connoted a display of authority. He asked his initial question from a seated position within his cruiser. In fact, the initial colloquial dialog with the defendant beginning with Officer DeJesus addressing the defendant as 'my man,' connotes a casual encounter." The court continued: "After the defendant failed to respond to his inquiry, Officer DeJesus exited his vehicle and approached the defendant to merely ask questions to determine his identity and investigate. The officer approached the defendant at an angle, so as not to appear confrontational and at no time did Officer DeJesus brandish his weapon. The officer did not engage in coercive or threatening behavior." The court concluded: "In the present case, the officer did not display any authority until he observed the defendant's

questionable and guarded behavior. On the basis of this evidence, the court concludes that the defendant was not seized until Officer DeJesus physically touched him and commenced the patdown.''

The court next concluded that the seizure was justified because DeJesus had a reasonable and articulable suspicion that the defendant was engaged in criminal activity. The court found: "[T]he nature of the 911 call coupled with Officer DeJesus' observations of the defendant immediately after the crime occurred, warranted a brief stop of the defendant. Here, the alleged criminal activity had occurred only moments before Officer DeJesus encountered the defendant in very close proximity to the location of the alleged crime. Further, the defendant's clothing, although not identical, was dark and generally matched the description of the suspect as described by the dispatcher. Additionally, it was early morning and the defendant was standing alone, in the dark, and in pouring rain. Based on the defendant's identifying features, clothing, location, and overall behavior, the officer had reasonable and articulable suspicion to stop the defendant to determine if he was involved in the domestic incident under investigation.'' The court found further support for this finding in the defendant's evasive behavior, stating that DeJesus' "initial suspicion was further aroused by the defendant's response to the officer's inquiry when the officer was seated in his vehicle. That response led the officer to step out of his vehicle and conduct a further inquiry. . . . Officer DeJesus believed the defendant was under the influence because of his conduct and demeanor. When considered in connection to violent crime . . . here—the assault of a female—a reasonable officer could conclude that, on the basis of his evasive behavior, that the defendant had recently been involved in criminal activity.'' (Citation omitted; internal quotation marks omitted.)

Lastly, the court concluded that DeJesus' patdown of the defendant was supported by a reasonable belief that the defendant might have been armed and dangerous. The court found: "Under the totality of the circumstances, including (1) the nature of the crime under investigation, (2) the defendant's close proximity to the crime scene, (3) that his clothing sufficiently matched the description of the suspect, (4) his location and the time of day, and (5) his appearance and behavior, the court finds that a reasonable officer would have an objective suspicion, based on articulable facts, to conclude that the defendant might be armed and dangerous.'' On the basis of those three conclusions, the court denied the defendant's motion to suppress the evidence.

Following the denial of his motion, the defendant pleaded nolo contendere[1] to one count of carrying a pistol without a permit and one count of criminal possession of a pistol.[2] The court, *Keegan, J.*, on May 15,

2015, sentenced the defendant to five years of incarceration, execution suspended after the mandatory minimum one year of incarceration, followed by a three year conditional discharge on the count of carrying a pistol without a permit, and five years of incarceration, execution fully suspended, with a three year conditional discharge on the count of criminal possession of a pistol.[3] The sentences were to run consecutively for a total effective sentence of ten years of incarceration, execution suspended after one year, and a three year conditional discharge.

On appeal, the defendant disputes the court's findings and argues that he was seized by DeJesus when DeJesus stopped his patrol cruiser nearby the defendant and called to him. In the alternative, he argues that he was seized when DeJesus exited his vehicle and approached him. He argues, as well, that DeJesus did not have a reasonable and articulable suspicion that the defendant was engaged in criminal activity at the time of the seizure and, therefore, it was unlawful regardless of when it occurred. Lastly, the defendant argues that because he was unlawfully seized, the officer's subsequent patdown of his person was similarly unlawful because DeJesus did not have reasonable suspicion that the defendant was armed and dangerous. In response, the state claims that the defendant was not seized until the officer physically touched him before patting him down for weapons. Further, the state claims that DeJesus' patdown of the defendant was justified by a reasonable belief that the defendant was armed and dangerous. The evidentiary record and the application of pertinent decisional law support the state's claims.[4]

We begin our analysis with a discussion of the standard of review. On appeal from the court's denial of a motion to suppress evidence, "it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 645, 613 A.2d 1300 (1992). The court's "finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 288, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). When, however, the basis of a defendant's claim is that the police conducted an unconstitutional search and seizure, we must, on review, "undertake a more probing factual review of allegedly improper seizures, so that we may come to an independent legal determination of whether a reasonable person in the

defendant's position would have believed that he was not free to leave. . . . A proper analysis of this question is necessarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority . . . . Although we must, of course, defer to the trial court's factual findings, our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether [each] finding is supported by substantial evidence . . . . Furthermore, in reviewing the record, we are bound to consider not only the trial court's factual findings, but also the full testimony of the arresting officers; in particular, we must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state but that the trial court did not expressly discredit." (Citations omitted; internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016).

Before turning to the defendant's specific arguments, we briefly discuss the overarching legal principles relevant to the defendant's claim. Interactions between the police and members of the public in public places can implicate the public's right to be free from unreasonable searches and seizures. "The fourth amendment [to the United States constitution], like article first, § 7 [of the Connecticut constitution], proscribes only 'unreasonable' searches and seizures. . . . A search or seizure is presumptively unreasonable when it is conducted without a warrant issued upon probable cause. . . . Nevertheless, several categories of searches and seizures have been deemed reasonable, and therefore lawful, even when officers lack probable cause or a warrant. . . . For instance, under *Terry* [v. *Ohio*, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], officers may temporarily seize an individual if they have a reasonable and articulable suspicion that he is involved in criminal activity. . . . As the court stated in *Terry*, 'we deal here with an entire rubric of police conduct—necessarily swift action predicated [on] the on-the-spot observations of the officer on the beat— which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the [f]ourth [a]mendment's general proscription against unreasonable searches and seizures.' . . . After balancing the state's legitimate interests in crime prevention and detection against a suspect's liberty interest . . . the court concluded that, when an officer has a reasonable basis for suspecting that an individual is committing or has committed a criminal offense, it is constitutionally permissible for the officer to briefly detain the individual for investigative purposes. . . . An accompanying patdown search is similarly justified if the police also have a reasonable basis to believe that the person stopped is armed and dangerous. . . . This

latter action does not violate the fourth amendment because of the immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kelly*, 313 Conn. 1, 16–17, 95 A.3d 1081 (2014).

I

We address first the defendant's two alternative arguments that he was seized by DeJesus either when DeJesus stopped his patrol cruiser nearby the defendant and called to him, or when DeJesus exited his vehicle and approached him. A seizure occurs when "by means of physical force or a show of authority, [an individual's] freedom of movement is restrained. . . . The key consideration is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 844–45, 955 A.2d 43 (2008). While the show of authority or coercion necessary to establish restraint is fact specific, our law is clear that the fact that an officer is in uniform when approaching a member of the public is not, alone, viewed as a sufficient sign of authority or coercion to constitute detention. See id., 849 ("[a]lthough we recognize that a uniformed law enforcement officer is necessarily cloaked with an aura of authority, this cannot, in and of itself, constitute a show of authority sufficient to satisfy the test for a seizure . . . ."); see also *State* v. *Hill*, 237 Conn. 81, 91, 675 A.2d 866 (1996) ("[t]he mere approach by a police officer, either in a police car or on foot, does not alone constitute a show of authority sufficient to cause the subject of the officer's attention reasonably to believe that he or she is not free to leave").

Although the assessment of whether a police officer's conduct vis-à-vis a member of the public constitutes a stop is necessarily fact-specific, the United States Supreme Court has provided some guidance for our analysis. The court opined: "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). In determining whether a seizure has occurred, our Supreme Court has also considered whether the police activated a siren or flashers, commanded the defendant to halt, displayed any weapons, or operated the police cruiser in an aggressive manner to block the defendant's course or

otherwise control the direction or speed of his movement. *State* v. *Burroughs*, supra, 288 Conn. 847.

With this guidance in mind, we turn to the defendant's specific claim that he was seized by DeJesus when DeJesus parked his marked police cruiser fifteen to twenty feet from where the defendant was standing and called to him "yo my man, what's your name?" The court rejected this claim and we agree. As noted by the court, when DeJesus stopped his cruiser fifteen to twenty feet from the defendant, he did not activate his lights or siren, he did not use any language or tone that connoted a display of authority, and he did not use his police cruiser in an aggressive manner to block or control the defendant's movement. He was still seated in his cruiser when he initially tried to speak with the defendant. On the basis of our jurisprudence on the matter, these circumstances do not constitute restraint. Accordingly, the defendant was not seized when DeJesus called to him from the police cruiser.

The defendant claims, in the alternative, that once DeJesus alighted from his cruiser and walked toward him, the officer's movements limited the defendant's movements and, accordingly, served to seize him. In this regard, he asserts that the location of the interaction in a fairly isolated area in the early morning hours of the day heightened the aura of the officer's authority. Thus, he claims, he was detained as soon as the officer began to approach him. The court found, however, that at this juncture DeJesus was approaching the defendant merely to ask him questions, that the officer approached at an angle so as not to appear confrontational, and that the officer did not, at any time in this process, brandish his weapon. Accordingly, the court concluded, the officer's approach to the defendant did not constitute a seizure. We agree. Under these circumstances, where the record is plain that the officer took no measures to impede the defendant's movement either by blocking his means of egress or by any threatening behavior, the officer's conduct in walking toward the defendant did not constitute restraint under all the existing circumstances. Accordingly, the defendant was not seized when DeJesus began walking toward him.

The court found, and the state argues, that the defendant was not seized until DeJesus physically touched the defendant. We agree. The record is clear that once DeJesus reached the defendant and physically touched him, the officer's conduct, at that juncture, constituted a detention of the defendant. Accordingly, the defendant was not seized until DeJesus physically touched him.

## II

We turn next to the defendant's argument that the seizure was unlawful, regardless of when it began, because DeJesus did not have a reasonable and articulable suspicion that the defendant was engaged in crimi-

nal activity at the time of the seizure. On this point the state and the defendant have different perceptions of the underlying factual circumstances and their implications. The defendant argues that when DeJesus reached out and physically touched the defendant, he was acting on a mere hunch that the defendant might be the suspect in the domestic violence incident, which was unreasonable because the defendant's clothing did not match the description issued by police dispatch. The defendant further argues that his behavior did not give rise to a reasonable suspicion for DeJesus to seize him. The state, on the other hand, claimed that DeJesus was justified in stopping the defendant because he sufficiently fit the description of the domestic violence suspect, because of his lack of response to the officer's questions and muddled behavior, and because he was found in an area geographically close to the alleged violent crime scene within minutes of the notification from the police dispatcher of having received a 911 call.

With respect to the defendant's clothing, the defendant argues that the clothing he was wearing did not match the description of clothing given by the 911 caller to dispatch regarding the alleged domestic violence assailant, and that, even though the 911 caller's description was not passed on by dispatch to DeJesus, he is charged with knowing that description under the collective knowledge doctrine. The defendant argues that, as a consequence, DeJesus reasonably could not have suspected the defendant as being the perpetrator. In response to the defendant's claim regarding the collective knowledge doctrine, the state argues that even if the officer could be charged with knowledge of the clothing description given by the 911 caller, the defendant's appearance in dark clothing in the rain and in the dark early morning hours was sufficiently alike to the description given by the 911 caller to be a factor supporting his reasonable suspicion that the defendant could be the domestic violence suspect.

The following additional information is relevant to this argument. The record reflects that the 911 caller described her assailant to the dispatcher as a black man dressed in a "black hoodie, black sweatpants, a chain around his neck, a fitted [hat], I believe an orange and grey fitted [hat]." Dispatch, however, did not relay this complete description. Rather, it described the alleged perpetrator as "Antoine," "a black male in all black," who had allegedly choked the victim and was believed to be hiding in the bushes outside the victim's home. The defendant, when approached by DeJesus, was not wearing all black, but instead, dark blue jeans, a dark grey jacket, and a navy blue skull cap. DeJesus testified at the suppression hearing, though, that due to the heavy rain, the defendant's clothing looked all black.

At the outset, we agree that DeJesus is chargeable with the collective knowledge of the police department.

The collective knowledge doctrine imputes onto an arresting officer the collective knowledge of the law enforcement organization at the time of the arrest. *State* v. *Butler*, 296 Conn. 62, 72–73, 993 A.2d 970 (2010). Therefore, the knowledge of both the arresting officer and the police department must be considered in determining whether there is probable cause for an arrest. Id. In *Butler*, our Supreme Court extended the application of the collective knowledge doctrine beyond determinations of probable cause, to circumstances warranting an officer's reasonable suspicions in a search and seizure context. Id., 73–74. In *Butler*, the question was whether the state could utilize the collective knowledge of the police department to substantiate its claim that the officer on the scene had a reasonable basis to suspect the defendant of criminal activity. Id., 74–75. The court opined: "Although this court typically has applied the collective knowledge doctrine to determinations of probable cause, we conclude that it is equally applicable to the reasonable suspicion determination. See, e.g., *United States* v. *Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ('[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers') . . . ." Id., 73. If the collective knowledge of the police department can be attributed to an officer on the scene in order to bolster the basis of the officer's reasonable suspicions, we can conceive of no reason that the doctrine should not be applied, with equal force, to information that can be imputed to the officer on scene that would tend to erode the reasonableness of an officer's suspicion.

That, however, does not complete our analysis regarding the collective knowledge doctrine because, in order to apply the doctrine to the case at hand, we would have to know that the person who received the 911 call from the alleged domestic violence victim was, in fact, a member of the New Haven Police Department. In that regard, the record reveals only that the alleged domestic violence victim called 911 and that the phone was answered by an individual who responded to the call by stating "New Haven 911." We know, as well, that DeJesus testified that he was dispatched to a certain address and given a description by dispatch of the assailant's clothing not as detailed as, and at some variance with, the description given by the 911 caller. Thus, we do not know whether the individual who answered the 911 call was a member of the New Haven Police Department whose knowledge, fairly, could be attributed to the officer on the scene under the collective knowledge doctrine.[5] For purposes of our resolution of this appeal, however, we will assume that the collective knowledge doctrine is applicable.

That said, we are aware that the description of clothing is merely one factor in all the circumstances an officer may consider in deciding whether to detain a member of the public. *State* v. *Gregory*, 74 Conn. App. 248, 257–58, 812 A.2d 102 (2002), cert. denied, 262 Conn. 948, 817 A.2d 108 (2003). The defendant's argument regarding the discrepancy between the defendant's clothing and that of the alleged domestic violence perpetrator is not unlike the argument made by the defendant before this court in *Gregory*. There, the defendant claimed that there was a discrepancy in the description of an assailant's clothing between the victim's claims and the actual clothing worn by the defendant when detained. Id., 258–59. On appeal, this court stated: "The police are . . . not required to confirm every detail of a description of the perpetrator before that person can be detained. . . . Rather, [w]hat must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." (Citation omitted; internal quotation marks omitted.) Id., 259. Along with its discussion on the comparison of the defendant's clothing to that of the suspect, the court in *Gregory* further noted: "The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness. . . . Proximity in the time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Citation omitted; internal quotation marks omitted.) Id., 257–58. Thus, even though the description of the assailant's clothing by the 911 caller is a relevant factor to the reasonableness of the officer's suspicion and subsequent detention of the assailant, the discrepancy in the clothing description is but one factor to consider in the overall circumstances bearing on the issue of reasonableness. With that in mind, we turn to a consideration of the other factors that led the court to find that DeJesus had a reasonable and articulable suspicion that the defendant was engaged in criminal activity at the time of the seizure.

The record reflects that DeJesus came upon the defendant at approximately 4:30 a.m. while it was dark and rainy and, from the patrol car, believed that he was wearing dark clothing, a description that matched that from the dispatcher's call. The defendant was located within a minute's walk from the scene of the alleged violent assault in a high crime and high drug use area. When the officer called to the defendant, the defendant was standing in the rain using a cell phone. Initially ignoring the officer, the defendant then mumbled to him while appearing to the officer to be under the influ-

ence of a controlled substance. Given the totality of those circumstances, and even assuming some discrepancy in the clothing description between what was told by the 911 caller to dispatch and what was relayed to DeJesus, it was nevertheless reasonable for him to suspect the defendant of criminal activity and, thus, to briefly detain him for the purpose of questioning him.

Additionally, given the high crime and drug usage character of the neighborhood where DeJesus discovered the defendant and the known association between violence and drug use, it was reasonable for the officer to conduct a patdown of the defendant for the officer's own safety before asking him more pointed questions. As noted, the court looked to "the nature of the 911 call coupled with Officer DeJesus' observations of the defendant immediately after the crime occurred" in determining that a brief stop of the defendant was warranted. The court relied on the proximity in time and location between the alleged criminal activity and the defendant, the general matching of the defendant's clothing to that of the suspect, the circumstances in which DeJesus found the defendant, namely alone in the dark and pouring rain, and the defendant's "evasive behavior" when engaged by DeJesus. The court concluded: "Based on the defendant's identifying features, clothing, location, and overall behavior, the officer had reasonable and articulable suspicion to stop the defendant to determine if he was involved in the domestic incident under investigation. . . . Thus, based upon the totality of the circumstances, Officer DeJesus had reasonable and articulable suspicion to believe that the defendant was indeed the suspect that had recently committed an assault." Contrary to the defendant's assertions, the record amply supports the court's conclusions. We agree with the court that the defendant's detention by DeJesus was reasonable under all the circumstances.

### III

Lastly, we turn to the defendant's claim that even if the investigatory stop by DeJesus was reasonable, the patdown and ensuing seizure of a weapon from him by the officer was unlawful because DeJesus did not have a reasonable suspicion that the defendant was armed and dangerous. In support of this claim, the defendant argues that even if his clothing could have been seen by DeJesus from his patrol car as resembling the description given by the 911 caller, once he got closer to the defendant he should have seen that the clothing did not match. The defendant also argues that his behavior in not cooperating with DeJesus and his intoxicated appearance cannot support a reasonable suspicion that he was armed and dangerous. Therefore, the defendant claims, the possibility that he was the perpetrator of the violent crime of domestic assault cannot be factored in to the calculus of whether, at the moment of the

patdown, DeJesus had a reasonable basis for believing that the defendant could be armed and dangerous. We disagree.

Our Supreme Court has recognized that "[a] police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. . . . The authority to permit a reasonable search for weapons for the protection of the police officer is narrowly drawn applying only where he has reason to believe that he is dealing with an armed and dangerous individual . . . . The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 234, 3 A.3d 806 (2010).[6] Additionally, "[w]hen making a split second decision, an officer is not required to calculate the probability that the defendant would proceed in a certain way before taking reasonable steps to protect himself and his fellow officers." (Internal quotation marks omitted.) *State* v. *Kelly*, supra, 313 Conn. 34.

On the basis of this jurisprudence, the court concluded: "Under the totality of the circumstances, including (1) the nature of the crime under investigation, (2) the defendant's close proximity to the crime scene, (3) that his clothing sufficiently matched the description of the suspect, (4) his location and the time of day, and (5) his appearance and behavior, the court finds that a reasonable officer would have an objective suspicion, based on articulable facts, to conclude that the defendant might be armed and dangerous."

While we believe the defendant's argument regarding the discrepancy between the clothing description given by the 911 caller and the clothing worn by the defendant, that discrepancy, as we have noted, is not the only factor to be considered in assessing the objective reasonableness of the patdown and seizure. Additionally, in assessing the officer's conduct, we must be mindful that he did not have the benefit of quiet contemplation before deciding what reasonable steps were appropriate to guard his safety. The United States Supreme Court's assessment of a police officer's reasonable use

of force is germane to the reaction of a police officer in an interaction with a member of the public. The court has opined: "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (Citation omitted; internal quotation marks omitted.) *Graham* v. *Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). As with a court's assessment of an officer's reasonable use of force, our assessment of the reasonableness of the officer's decision to conduct a patdown of the defendant must be guided by a realization that the officer was required, for the sake of his own safety, to make an immediate on the spot assessment of whether the defendant was likely to be armed and dangerous under all the circumstances then existing. Those circumstances included, as well as the physical description of the domestic violence suspect and the clothing he was wearing, the fact that the defendant was found in an area close by the crime scene, at approximately 4:30 a.m., in the dark, in a high crime and drug use area, standing in the rain, and when the officer approached the defendant, he observed that he was mumbling and swaying, behaving in a way that reasonably suggested to the officer that the defendant was under the influence of a controlled substance.

Under all those circumstances, it was reasonable for DeJesus to be concerned for his safety and to make the judgment that the defendant might be armed and dangerous. Therefore, he had a reasonable basis to pat down the defendant and, once discovered during the patdown, to seize the weapon from the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court found that the denial of the motion to suppress was dispositive of the case.

[2] The state entered a nolle prosequi with respect to the remaining count, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).

[3] The court noted on the record that at the time of the offense § 53a-217c did not carry a mandatory minimum jail sentence.

[4] In the alternative, the state claims that the exclusionary rule's new crime exception bars suppression of the gun. Because we affirm the court's denial of the motion on other grounds, we need not address this argument.

[5] It does not appear that our Supreme Court or this court has had the occasion to determine whether the "collective knowledge" doctrine applies in a situation in which information is received by a civilian 911 dispatcher and then relayed to a police officer. In short, we have not determined whether information in possession of a civilian dispatcher can be attributed to a police officer on the scene. As noted in the state's brief, federal Circuit Courts are not in agreement on this question. See *United States* v. *Whitaker*, 546 F.3d 902, 909–10 n.12 (7th Cir. 2008) (knowledge of civilian 911 dispatcher can be imputed onto police officer); *United States* v. *Colon*, 250 F.3d 130, 135–38 (2d Cir. 2001) (knowledge of 911 dispatcher cannot be

imputed onto arresting officer where no evidence dispatcher had special training in assessing the existence of probable cause). In the case at hand, however, we need not answer this question for reasons set forth in our opinion. Thus, we leave this issue for another day.

[6] Thus, like the trial judge, we do not weigh the reasonableness of DeJesus' conduct by reference to his stated practice, reflected in his statement to the court that "I pat everybody down. . . . I pat [them] down for my safety. . . . [T]his is not the first time that somebody pulled a gun on me, so, you know, I'm [going to] protect myself." We echo the court's affirmation that the judicial review of a police stop and patdown of a member of the public can only be based on an objective test of reasonableness under the particular circumstances and not by reference to an officer's general proclivities. Indeed we disapprove of such a practice as presenting a high risk of being an unconstitutional intrusion, saved, perhaps, only by the operative facts of any such police-public interaction.

————————————————